UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:10-CR-85 |
| | ) | |
| WILLIAM JAMES LYON, IV | ) | |

## REPORT AND RECOMMENDATION

The defendant has filed a motion to suppress all statements he made to law enforcement agents on the basis that they were given "under duress and were involuntarily made." (Doc. 25). This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on November 12, 2010.

Although defendant's motion does not explicitly so state, it is assumed that defendant seeks to suppress statements he made to two FBI Special Agents in New Jersey on July 15, 2010, and thereafter to Special Agent Bishop in Johnson City, Tennessee.

The only witnesses who testified were FBI Special Agent David Bishop, who works out of the Johnson City, Tennessee office, and Special Agents Joshua Wilson and Derek Reick, Special Agents assigned to the Newark, New Jersey field office.

For more detailed background information, reference is made to the report and recommendation earlier filed with regard to defendant's motion to suppress evidence seized as a result of a warrant authorizing the search of his home that was executed on July 15,

2010, and a subsequent search of a laptop computer.[1]

On July 15, 2010, Special Agent Bishop, accompanied by Special Agent Lane Rushing, arrived at defendant's home in Blountville, Tennessee, to execute a search warrant issued by this court. Defendant's wife, Heidi Lyon, was in the residence, along with their three daughters and a friend. Agent Bishop told Mrs. Lyon why he was there – to execute a search warrant – and he also told her the reason for that search. Mrs. Lyon told Special Agent Bishop that her husband was in New Jersey to attend a meeting or seminar at his employer's offices, and that he had with him a laptop computer owned by his employer, as well as a Hewlitt Packard laptop recently purchased by defendant.

Special Agent Bishop requested Special Agent Rushing to contact the FBI office in Newark, New Jersey, and request that agents there contact and interview defendant. Agent Rushing did so, as a result of which Special Agents Wilson and Reick of the Newark, New Jersey field office went to the office of defendant's employer that same day, i.e., July 15, 2010.

Defendant's employer had been contacted before the agents arrived, and Ms. Barbieri, Assistant General Counsel for the employer, met the agents when they arrived, and she took them to a conference room. Attorney Barbieri instructed another employee to retrieve defendant from a meeting he was attending, and to bring him to the conference room.

There was nothing unusual about the conference room; it was 10' x 15', or perhaps

---

[1]Report and Recommendation, Doc.39.

even larger, and it contained a conference table and chairs. When defendant arrived, attorney Barbieri took from defendant the company computer in his possession, and then left the room. Defendant sat in a chair with his back to the door, and the two FBI agents sat across the table from him. Agent Wilson was dressed casually, in blue jeans. Agent Reick was wearing a suit. Both agents were armed, as anyone would expect them to be, but their weapons were never drawn or exhibited.

Agent Wilson first asked defendant if he had talked to his wife that morning, which understandably caused defendant some trepidation for a moment, but Agent Wilson quickly told defendant that his wife and children were fine. Wilson went on to say that a search warrant had just been executed at his house in Tennessee, looking for evidence of child pornography. At that point, so Wilson testified, defendant physically sagged, his chin dropping to his chest.

Agent Wilson told defendant that he not under arrest; that he did not have to talk to them; that he could leave, if he wished to do so; but he was "looking for his cooperation," if that is what he wanted to do.

Defendant quickly and freely admitted that he had downloaded images of child pornography, and he also acknowledged that he owned two computers, one of which was the Hewlitt Packard laptop. He went on to describe the search terms he used to find and download child pornography, and that about 15% of his total collection of pornography was of children. He went so far as to describe some of the images as depicting children "disgustingly young." He appeared to be genuinely remorseful.

Agent Wilson ultimately asked defendant if he could see the Hewlitt Packard laptop and the external storage devices, such as thumb drives. He again emphasized that defendant was free to decline, if he wished, but if he did agree to show them the equipment, it would "be a measure of his cooperation."

Defendant agreed to go to his hotel with the FBI agents to show them the computer and equipment. In his cross examination of Wilson and Reick, defendant's counsel suggested by his questions that defendant asked them if he would be handcuffed as they left the building; both agents denied that defendant asked such a question. It is noted that defendant himself did not testify. All three FBI agents who testified at the suppression hearing were extremely credible. Special Agents Wilson and Reick not only were credible, they were also rather definite and specific about the conversations and events that took place in New Jersey. In any event, even if defendant did ask that question, it would not alter the fact that defendant (1) was not under arrest; (2) was not in custody; and (3) Agents Wilson and Reick made it clear several times in the course of their meeting with defendant that he did not have to talk to them and that he was free to leave and terminate the conversation if he wished to do so.

Since defendant had no vehicle in New Jersey, he rode with the FBI agents back to his hotel. The FBI vehicle was a Chevrolet Impala, a normal passenger vehicle that had no "cage" or anything similar in it. In fact, defendant rode in the front passenger seat along with the driver, Special Agent Reick.

When they arrived at the hotel, defendant and the two agents went to his hotel room,

4

and defendant showed them his computer and the peripheral storage devices. Special Agent Wilson requested permission to take the computer, although he again told defendant that he did not have to do so. Defendant agreed, and in that regard he executed a "Consent To Search Computers Form."[2]

Defendant asked Agent Wilson if there was an FBI agent in Tennessee to whom he could talk. Agent Wilson contacted Special Agent Bishop for permission to give defendant his name, and Bishop agreed. Shortly thereafter, on July 15, 2010, defendant phoned Agent Bishop from New Jersey, telling Bishop that he was "willing to cooperate." After defendant returned to Tennessee, he visited Agent Bishop, and they discussed the possibility of defendant pleading guilty to an Information, so defendant could avoid the spectacle attendant to being arrested in front of his children.

Defendant was not placed under arrest until the Grand Jury returned the instant indictment against him.

So-called *Miranda* warnings are required only when a subject is interrogated while in custody, or the functional equivalent of custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). Whether a defendant is "in custody" for purposes of a *Miranda* warning is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). There is no exhaustive list of factors, but the ususal factors that a court should consider

---

[2]Ex. 1.

include the purpose of the questioning; whether the situs of the questioning is hostile or coercive; the length of questioning; and whether the suspect's freedom of movement was curtailed to any extent. *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

Here, the purpose of the questioning was an on-going investigation regarding the receipt and distribution of child pornography, an extremely serious crime, and these FBI agents knew fully well that defendant was a target of the investigation.

The place of their questioning, however, was anything but hostile or coercive; it was a conference room at his employer's offices, far more familiar and comfortable to him than to the two FBI agents. The length of the questioning was rather brief, approximately thirty minutes.

Most importantly of all, Special Agent Wilson told defendant not once, but several times, that he was not under arrest, that he did not have to talk to them, and that he was free to leave at any time if he wished. Not only was defendant *objectively* not in custody or under arrest, no reasonable person in his position would have believed that he was not free to leave. *See, United States v. Mahar*, 801 F.2d 1477, 1499 (6th Cir. 1986).

Nothing ever said or done by either of these FBI agents could remotely be described as hostile or coercive. To be sure, Special Agent Wilson told defendant that he was under investigation for child pornography, and the specter of being prosecuted for that offense is calculated to upset anyone, but being told that you are suspected of a crime does not in and of itself create a hostile or coercive environment. In fact, the entire interview between defendant and these two agents could only be characterized as cordial.

Wilson's statements to defendant that "he was looking for his cooperation" did not constitute coercive conduct. To the extent that Wilson's statements could be construed as a promise of leniency, such was not improper unless the promise was illusory. *See, Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991). Cooperation, as a manifestation of an acceptance of responsibility, would be a positive fact under the Guidelines.

The proof at the suppression hearing reveals that defendant's statements made to the FBI agents in New Jersey, and then his subsequent conversation with Special Agent Bishop in Tennessee (which defendant initiated), was the product of defendant's voluntary and knowledgeable choice. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

It is respectfully recommended that defendant's motion to suppress (Doc. 25) be denied.[3]

Respectfully submitted,

    s/ Dennis H. Inman
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).